QVC NETWORK, INC., Plaintiff,

v.

PARAMOUNT COMMUNICATIONS INC., Viacom Inc., Martin S. Davis, Grace J. Fippinger, Irving R. Fischer, Benjamin L. Hooks, Franz J. Lutolf, James A. Pattison, Irwin Schloss, Samuel J. Silberman, Lawrence M. Small, and George Weissman, Defendants.

In re PARAMOUNT COMMUNICATIONS INC. SHAREHOLDERS LITIGATION.

C.A. Nos. 13208, 13117.

Court of Chancery of Delaware, New Castle County.

Submitted: Nov. 21, 1993.
Decided: Nov. 24, 1993.
Revised: Nov. 26, 1993 and Dec. 7, 1993.

Bruce M. Stargatt, David C. McBride, Josy W. Ingersoll, and Bruce L. Silverstein, of Young, Conaway, Stargatt & Taylor, Wilmington, and Herbert M. Wachtell (argued), Michael W. Schwartz, Theodore N. Mirvis, Paul K. Rowe, and George T. Conway III, of Wachtell, Lipton, Rosen & Katz, New York City, for plaintiff QVC Network, Inc.

Irving Morris, Karen L. Morris, and Abraham Rappaport, of Morris & Morris, Pamela S. Tikellis, Carolyn D. Mack, and Cynthia A. Calder, of Chimicles, Burt & Jacobsen, Joseph A. Rosenthal and Norman M. Monhait, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Arthur N. Abbey (argued) and Mark C. Gardy, of Abbey & Ellis, Daniel W. Krasner and Jeffrey G. Smith, of Wolf, Haldenstein, Adler, Freeman & Herz, New York City, for Shareholder plaintiffs.

Charles F. Richards, Jr., Thomas A. Beck, and Anne C. Foster, of Richards, Layton & Finger, Wilmington, and Barry R. Ostrager (argued), Michael J. Chepiga, Robert F. Cusumano, Mary Kay Vyskocil, and Peter C. Thomas, of Simpson, Thacher & Bartlett, New York City, for defendants Paramount

Communications, Inc., and individual defendants.

A. Gilchrist Sparks, III, Lawrence A. Hamermesh, and William M. Lafferty, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Stuart J. Baskin (argued), Jeremy G. Epstein, Alan S. Goudiss, and Seth J. Lapidow, of Shearman & Sterling, New York City, for defendant Viacom Inc.

### MEMORANDUM OPINION

JACOBS, Vice Chancellor.

QVC Network, Inc. ("QVC") and a class of public shareholders of Paramount Communications, Inc. ("Paramount"), separately filed actions in this Court seeking preliminary and permanent injunctive relief against a proposed two-step acquisition of Paramount by Viacom Inc. ("Viacom"). The first step, a cash-tender offer by Viacom for 51% of Paramount's outstanding shares for $85 per share, is currently scheduled to close at midnight on November 24, 1993. The second step would be a merger of Paramount into Viacom, wherein the remaining shares of Paramount would be converted into a package of securities consisting of Viacom common (voting and nonvoting) and convertible preferred stock.

On October 21, 1993, QVC filed this action,[1] and announced a tender offer for 51% of Paramount's outstanding shares for $80 per share cash, to be followed by a second-step merger in which the remaining Paramount shares would be converted into QVC common and convertible preferred stock. On November 12, 1993, QVC raised the cash portion of its bid to $90 cash for 51% of Paramount and the remaining 49% in a package of equivalently valued securities consisting of QVC common and convertible preferred stock. The QVC offer is currently scheduled to close seven days after the closing date for the Viacom offer.

In its motion for a preliminary injunction QVC seeks, inter alia, (i) to invalidate certain so-called "lockup" agreements, including a stock option granted by Paramount to Viacom, and an agreement to pay a $100 million termination or breakup fee, both of which would become payable if the Viacom–Paramount transaction is not consummated; (ii) to prevent Viacom from consummating its tender offer and the second step merger until the lockups are invalidated and all other impediments (including Paramount's "poison pill" Rights Agreement) are made inapplicable to QVC's offer, and (iii) to require Paramount and its directors to remove all other impediments to QVC's tender offer so that it can be considered by Paramount shareholders on an equal footing with the Viacom transactions. The shareholder plaintiffs have moved for similar relief.

The Court scheduled a hearing on the injunction motions for November 16, 1993, and ordered that discovery and briefing proceed on an expedited basis. During the two and one-half week discovery period, an extensive record was developed, and briefs exceeding 400 pages were filed. The matter was heard as scheduled on November 16, 1993. Thereafter, the Court requested the parties to supplement the record, necessitating additional discovery and briefing.[2] This is the Opinion of the Court on the plaintiffs' motions for a preliminary injunction.

### I. PERTINENT FACTS

The pertinent facts are largely undisputed. Where they are disputed, the facts are as found (preliminarily) below.

#### A. The Parties and Their Businesses

Paramount is a publicly held Delaware corporation with its principal offices in New York City. It is a global producer and distributor of entertainment, with operations in motion pictures, television programming, cable and broadcast television, home video, theaters, sports and special events. Paramount

---

1. The shareholder plaintiffs filed similar actions during October, 1993. Those actions have been consolidated.

2. The supplemental submissions were filed on Sunday evening, November 21, 1993. As a result of the post-hearing discovery, and the need for the Court to properly consider the late-filed evidence, Viacom and QVC extended the closing dates for their respective offers to November 24 and December 1, 1993.

is also a leading book publisher serving consumer, educational, and professional information markets in the United States and internationally. On November 10, 1993, Paramount strengthened its position by agreeing to acquire Macmillan Inc.. VEx.[3] 4. Paramount has approximately 118 million shares outstanding. Its total assets were worth $7.2 billion as of July 31, 1993, and its revenues for the six months ending April 30, were $1.9 billion. QEx. 6 at 13.

Paramount's board of directors consists of fifteen directors, of which four are officers of the company: Martin S. Davis ("Davis"), Chairman and Chief Executive Officer of Paramount since 1983 (Paramount director since 1967); Donald Oresman ("Oresman"), Executive Vice–President, Chief Administrative Officer and General Counsel of Paramount (since 1976); Stanley R. Jaffe, President and Chief Operating Officer (since 1991); Ronald L. Nelson, Executive Vice–President and Chief Financial Officer (1992). PEx. 79 at P60207–8. Paramount's eleven "outside" directors are persons of distinction experienced in the world of business and finance, and are present or former senior executives of public corporations or financial institutions. *Id.;* PAB at 14–15. Lazard Freres & Co. ("Lazard"), represented by its partners Felix G. Roharyn, Steven Rattner, and Peter Ezersky, is Paramount's financial advisor in this transaction.

Viacom, a publicly held Delaware corporation headquartered in Massachusetts, operates a diversified entertainment and communications company whose core businesses include MTV Networks and Showtime Networks Inc. VEx. 1 at 190003W. MTV Networks comprises several basic cable television networks, including MTV, VH–1, and Nickelodeon/Nick at Nite. Showtime Networks Inc. operates Showtime, The Movie Channel and FLIX, three premium television networks. Viacom also participates in three joint venture cable services: Comedy Central, Lifetime and All News Channel. VEx. 1 at 190003W.

Viacom is controlled by Mr. Sumner M. Redstone ("Redstone"), its Chairman and Chief Executive Officer. The 70–year–old Mr. Redstone owns 91.7% of National Amusements, Inc. ("NAI"), which in turn owns approximately 85.2% of Viacom's voting Class A stock and approximately 69.2% of Viacom's nonvoting Class B stock. QEx. 6 at 14; QEx. 9 at V003318. Equity co-investors in the proposed Paramount–Viacom merger are NYNEX Corporation and Blockbuster Entertainment Corporation. QEx. 6 at 15. For the six-month period ending on June 30, 1993, Viacom had revenues of $966.4 million and net earnings of $1.02 million. Its total assets were then worth almost $4.5 billion. *Id.* at 16 (unaudited financial data). Smith Barney Shearson Inc. ("Smith Barney"), represented by its Chairman, Robert Greenhill, is Viacom's financial advisor in this transaction.

QVC, a Delaware corporation headquartered in West Chester, Pennsylvania, is a nationwide general merchandise retailer that operates one of the leading televised shopping networks in the United States. Through its merchandise-focused television program, QVC sells a wide variety of consumer products. Live program hosts describe and demonstrate the featured items, and viewers place orders with QVC by calling a toll-free number. QEx. 5 at 20. Allen & Company Inc., represented by Messrs. Herbert A. Allen and Enrique F. Senior, is the financial adviser to QVC in this transaction.

QVC's Chairman and Chief Executive Officer is Mr. Barry Diller ("Diller").[4] QVC is currently controlled by a group of equity

---

3. Throughout this Opinion "VEx" refers to Viacom documentary exhibits; "QEx" refers to QVC exhibits; "PEx" refers to Paramount exhibits; QOB refers to QVC's opening brief; and PAB refers to Paramount's answering brief. Citations to "PEx. No. 19 Letter" refers to the documents filed as exhibits to the Nov. 19 letter submitted by Paramount.

4. Diller joined QVC in January of this year after serving twelve years as Chairman and Chief Ex-

ecutive Office of Fox, Inc. Previously, Mr. Diller had served as Chief Executive Officer of Paramount Pictures Corporation, the motion picture studio subsidiary of Gulf & Western Inc. QOB at 4. Mr. Diller left Paramount Pictures in 1984, one year after Mr. Davis became Chairman and Chief Executive Officer of Gulf & Western, which later was renamed Paramount Communications Inc. QEx. 5 at 52; Davis Dep. at 4.

investors consisting of Liberty Media ("Liberty"), led by John Malone, Chief Executive Officer of Tele–Communications Inc. ("TCI"); Comcast, a public company largely owned by the Roberts family; and Mr. Diller. *Id.* Other significant investors in QVC include Advance Publications and Cox Enterprises. Pursuant to a Federal Trade Commission ("FTC") consent order, on November 11, 1993, QVC and Liberty entered into an agreement under which Liberty and its affiliates will terminate their interests in QVC if QVC merges with Paramount. Senior Aff. Ex. A at 4–5, 16 (QVC Offer To Purchase, November 12, 1993). BellSouth Corporation has made a commitment to join the QVC control group to replace Liberty's interest in QVC, and will then become QVC's largest shareholder. VEx. 9.

Although QVC is smaller than Viacom and Paramount, over the past few years it has grown substantially. QVC's total assets are worth $750 million. QVC's revenues increased from $193.2 million for fiscal year 1989, to $1.07 billion for fiscal year 1993. During that same period, QVC's net income increased from $9 million to an estimated $55 million for fiscal year 1993. QEx. 5 at 21 (unaudited financial data).

### 1. *Paramount's Long–Term Strategic Objectives*

Beginning in 1983, Mr. Davis led a management team devoted to transforming Gulf & Western (later named Paramount) into a major entertainment and publishing company. The corporation embarked upon a three-phase strategic restructuring plan that involved divesting certain capital intensive operations, liquidating its marketable securities portfolio, and acquiring entertainment and publishing companies. Pattison Aff. ¶ 4; Oresman Aff. ¶¶ 4–7. In order to compete in a rapidly evolving global marketplace, Paramount recognized the need to increase its size and financial strength. PEx. 40; Pattison Aff. ¶ 6. In pursuit of those goals, Paramount attempted to acquire Time Inc. in 1989. *See Paramount Communications v. Time, Inc.,* Del.Supr., 571 A.2d 1140 (1990). Despite being unsuccessful in that endeavor, the Paramount board continued to attempt to build Paramount into a major communications and media company through mergers or acquisitions. Pattison Tr. at 38–39, 84–85. Between 1989 and the spring of 1993, Paramount and its advisors considered and evaluated the possibilities of a merger with or acquisition of several video media companies. However, none of these explorations bore fruit. Pattison Aff. ¶ 8; Pollack Aff. ¶ 12.

In furtherance of Paramount's goals, in 1990, Allen & Co. (the same investment bank presently advising QVC) attempted to arrange a merger between Paramount and Viacom. PEx. 44 at V007332. Believing that such a merger would be an "attractive" transaction for Viacom, Mr. Senior of Allen & Co. told Mr. Redstone that the assets of Paramount and Viacom were a "very good business fit." Senior Dep. at 22–23. Nonetheless, Mr. Senior's efforts were unavailing. The important reason for those talks breaking down were Mr. Davis's insistence that he become CEO, and Mr. Redstone's insistence that he retain voting control of the merged entity. Senior Dep. at 65–66, 173.

The record establishes that Paramount's board was well informed of Paramount's strategic goals and of the steps taken by management to achieve those objectives. For example, at a board retreat in early May 1993, the board was presented with, and considered, four books detailing Paramount's long-range strategic aims and the alternative methods of achieving them. PEx. 1; Small Dep. at 94. Management had been exploring alternatives with Viacom, Turner Broadcasting System, Inc. and TCI, as well as other entities that they believed would "fit the strategic plan." Small Tr. at 242–43. By that point, public speculation about Paramount as a potential takeover target had begun to surface. QExs. 69, 70.

### B. *Preliminary Paramount– Viacom Negotiations*

### 1. *First Round*

On April 20, 1993, Messrs. Redstone and Davis held a dinner meeting, attended by Mr. Greenhill, and discussed the benefits of a possible combination between Paramount and Viacom. Greenhill Dep. 11–13. Thereafter, Redstone and Davis (with others) met

on four other occasions in June. More intensive negotiations among their representatives followed in early July.

Confidentiality agreements were signed on July 1. On July 6, Viacom and Paramount representatives and advisors met to discuss the potential transaction, and reached an agreement in principle on certain points. Each share of Paramount would be exchangeable for 0.10 of a Viacom Class A share and 0.90 of a Viacom Class B share, plus a cash component. Davis would manage the combined company as chief executive officer, and Redstone would become the controlling shareholder, holding (through NAI) approximately 70% of the outstanding shares of the merged entity. Rattner Dep. 45–61 *passim.*

However, on July 7, the parties reached an impasse over issues of price and lockup stock options. The total value of the deal Viacom proposed was $60.86 per share, with a ceiling (or "cap") of $65 per share to accommodate upward fluctuations in Viacom stock. The cash component of Viacom's package of consideration was $13.50 per share. Paramount, though, firmly sought a starting price in the $70s. Pattison Tr. at 112–13.

Regarding lockup terms, Viacom first sought an asset lockup in the form of an option to purchase Paramount's movie studio. Paramount and Lazard representatives rejected Viacom's request, and Viacom withdrew it. Rohatyn Aff. ¶¶ 5–7. Viacom also wanted lockups in the form of (i) a stock option to purchase at least 19% of Paramount's outstanding shares exercisable at the market price (then $54.75 per share), and (ii) a $150 million termination fee, plus expenses, exercisable and payable to Viacom if a higher competing bid by a third party defeated the transaction. *Id.* at ¶ 5. Lazard

viewed a stock option exercisable at the market price as inconsistent with options previously granted in comparable transactions. *Id.* at ¶ 8. Negotiations accordingly broke down on July 7, 1993, because Lazard and Paramount's Executive Committee considered Viacom's proposed price per share inadequate. PEx. 4 at P0031491; Rattner Dep. 63–66. Nonetheless, the parties remained in contact over the summer. On August 20, 1993, negotiations resumed.

### 2. Interim Activity

Between the breakdown of discussions in July and their resumption on August 20, two events occurred. First, Mr. Davis, alerted to and apparently concerned about a possible takeover bid by QVC, invited Mr. Diller to lunch and told him that Paramount was not for sale. Davis Dep. 57, 59. Mr. Diller responded that he had no intention of making a bid at the time. Diller Dep. 36–7.[5]

Second, Mr. Redstone, through NAI, made open market purchases of Viacom Class B shares during July and August. Plaintiffs contend that those purchases either caused or significantly contributed to a large jump in the market price for Viacom shares—from $46.875 on July 6 to $57.25 on August 20. The significance of that point is that the Viacom Class B shares would ultimately comprise the bulk of the stock component of the Viacom bid. However, Redstone had ceased this "program" trading by August 20, when Viacom and Paramount resumed discussions.[6] QEx. 66.

### 3. Second Round

On August 20, 1993, Mr. Greenhill arranged another meeting between Messrs. Davis and Redstone to revive the discussions.

---

5. Plaintiffs claim that Paramount knew full well that QVC would make an offer. Diller Dep. at 181 ("Notwithstanding my constantly saying to Mr. Davis, which I [Diller] was doing for clearly tactical reasons, that when I had something to say to him I would pick up the phone and call him, he consistently said to me, I know you are after my company."). Mr. Davis testified that his intent was not to dissuade a hostile bid from Diller, but that he "assumed there was no bid [and] took [Diller] at his word." Davis Dep. at 59.

6. Smith Barney analyzed Mr. Redstone's trading, and concluded that it was not responsible for increasing the price of Viacom's Class B stock. That firm observed that "where Mr. Redstone made his most significant share repurchases, the stock price actually declined, and when he made the least purchases the stock price increased considerably." QEx. 66 at SB003384. Plaintiffs note, however, that the study was never furnished to the Paramount board.

Oresman Aff. ¶ 22. On August 25 these discussions once again broke down over disagreements about price and termination provisions. Pollack Aff. ¶ 15. Specifically, Paramount unsuccessfully sought protection against the risk of a possible decline in Viacom share prices through three mechanisms: (a) a collar [7]; (b) the right to terminate the merger agreement if share prices declined below an agreed upon "floor"; and (c) the right to terminate the agreement if Lazard were unable to issue a fairness opinion. Rohatyn Dep. 17–18. For its part, Viacom continued to seek breakup fees and a stock option.[8]

### 4. *Third Round*

The parties restarted their merger negotiations in early September. By September 7 another version of a merger had been negotiated in which each share of Paramount would be exchanged for 0.10 Viacom Class A share, 0.90 Viacom Class B share, and $9.10 in cash for a total package valued at $69.14. PEx 6. at P30074. Viacom also bargained for a $100 million termination fee (down from $150 million) and a lockup stock option, whose terms were yet to be determined. On September 8, the parties then undertook due diligence investigations, and negotiated the Original Merger Agreement, the Original Stock Option Agreement and the Original Voting Agreement, all of which are described more fully below. *Id.*

### a. *The September 9 Paramount Board Meeting*

On September 9, 1993, at a regularly scheduled meeting, Mr. Davis briefed the Paramount board about the aforementioned negotiations and the possibility of a merger with Viacom. PEx. 8 at P80386. Davis pointed out that no matter how the merger was structured, Redstone would "emerge as the controlling shareholder of the combined company." *Id.* at P80387. The directors were furnished a "book" of materials prepared by Lazard describing the proposed transaction, including an abridged chronology of the preliminary negotiations. PEx. 6 at P30072–74, overviews of the two companies, analyses of the premiums paid in comparable cash and stock swap deals, *id.* at P30116–22, comparable transactions, *id.* at P30125–28, and a price and trading history of both classes of Viacom stock. *Id.* at P30102. The meeting focused largely upon the Lazard "book" and to the explanation of the proposed transaction. No merger-related decisions were reached at that time.

### b. *The September 12 Agreements*

Three days later, at a special meeting held on September 12, 1993, the Paramount board approved the proposed merger with Viacom. Pursuant to that board approval, Paramount executed the Original Merger Agreement, the Original Stock Option Agreement and the Original Voting Agreement that same day. Under the Original Merger Agreement: (i) each Paramount share would be converted into 0.10 Viacom Class A share, 0.90 Viacom Class B share and $9.10 in cash. PEx. 28 at P72579–80 (Original Merger Agreement § 2.01(a)). That stock and cash package was valued at $69.14 per share. The Merger Agreement contained no "collar" or similar

---

**7.** A collar guarantees a minimum price or consideration to the recipient of securities in a merger. It operates to increase the number of shares payable to the recipient to adjust for a decline in the market price, so that the number of shares multiplied by the market price will always equal the dollar amount of the guaranteed merger consideration.

**8.** Plaintiffs contend that during these negotiations Viacom withdrew its request for a *stock* option lockup, but that Paramount nonetheless granted it in order to make the transaction "look strong" and to ward off other bidders. In support of their position, plaintiffs cite an internal chronology compiled by Mr. Ezersky, a Lazard representative present at the negotiations, that recites the following entry for August 25: "Withdrew request for lock-up, repeated $150 million break-up fee and expense reimbursement with a cap," QEx. 51 at L004932, and "No lock-up option. $25 million break-up fee or $75 million topping fee." QEx. 51 at L004934 (with term sheet attached including no lockup option provision). Paramount responds by arguing that it rejected Viacom's request for an asset lockup, and that Viacom never withdrew its request for a stock option lockup. Based upon the affidavits of Messrs. Rohatyn and Pollack, I find it more plausible to conclude that the reference to withdrawn lockups was to Viacom's request for an *asset* lockup on Paramount's motion picture studio. Rohatyn Aff. at ¶¶ 9–10.

protections against a decline in the market price for Viacom stock. (ii) The Paramount board would amend its "poison pill" Rights Agreement so that it would not be triggered by the execution and closing of the Original Merger Agreement or the Stock Option Agreement. PEx. 28 at P72594–5 (Original Merger Agreement § 3.13). (iii) The Merger Agreement contained a "no-shop" provision prohibiting Paramount from soliciting or considering competing transactions, unless the board, upon advice of counsel, determined in good faith that its fiduciary obligations so required. PEx. 28 at P72608–09, P72615 (Original Merger Agreement §§ 6.02, 6.10). (iv) Viacom's expenses in making a bid would not be reimbursed. Instead, Viacom would receive a termination fee of $100 million, payable if Paramount terminated the Merger Agreement as a result of a competing transaction, or if shareholders failed to approve the merger, or if the board recommended a competing transaction. PEx. 28 at P72624–5 (Original Merger Agreement § 8.05(b)).

Also important is the "lockup" stock option. Under the Original Stock Option Agreement (at § 1.01), Viacom would be permitted either (a) to exercise an option to purchase approximately 19.9% (23,699,000 shares) of Paramount's outstanding common stock at $69.14 per share,[9] PEx. 29 at P20073, or (b) to "put" the option to Paramount and receive a cash amount computed in a manner specified in the Option Agreement (the "Buyout Alternative").[10] QOB at 26. Viacom ultimately agreed to an option exercise price at the "deal price" ($69.14) rather than at the then "market price" ($54.75), as Viacom originally requested. Rohatyn Aff. ¶ 11.

If accomplished, the September 12 merger transaction would shift voting control from the Paramount public shareholders to Redstone, by vesting an approximate 70% voting interest in the combined corporation in NAI, which Redstone controls. The CEO of the merged entity would be Mr. Davis. Although the Paramount shareholders would become minority shareholders in the merged Paramount–Viacom entity, the Merger Agreement contained no provision that would protect the (former) Paramount shareholders from being eliminated from the enterprise by means of a "cash out" merger.

### c. The September 12 Paramount Board Meeting

On September 12, 1993, the board met for approximately three hours, and approved the above-described agreements. Both management and Lazard provided materials to the directors. The management materials included detailed term sheets for the Original Merger, Stock Option, and Voting Agreements, PEx. 9, a business overview of a combined Viacom–Paramount entity, and statements of pro forma revenues, operating cash flow and capitalization of the proposed corporation. PEx. 10. Mr. Davis reviewed these documents with the board, and concluded that the merger was consistent with Paramount's long term strategy and goals for sustained growth. PEx. 16 at P80390.

The voluminous Lazard materials included an overview of the transaction, business and financial analyses and valuations of the two companies, a list of six potential acquirors or groups of acquirors of Paramount,[11] and an analysis of a "status quo" alternative. PEx. 11 at P30133–73. Lazard's presentation included discounted cash flow values for Paramount ranging from $61 to $73 per share, and breakup values ranging from $62 to $76 per share. *Id.* at P30170, 30151. In an

---

9. The stock option could be exercised for $1.00 in cash, the par value per share, plus a senior subordinated note of a Viacom subsidiary, Viacom International Inc., for the remainder of the exercise price ($68.14 per share). PEx. 29 at P20075 (Original Stock Option Agreement § 1.04).

10. The election to "put" the options to the corporation would be triggered by the execution of an agreement, or the consummation of a merger, with another bidder. PEx. 29 at P20080–1.

11. Notwithstanding this listing of other potential acquirors, the Lazard September 12 fairness opinion clearly states that no preagreement "market check" had been undertaken:

> we were not asked by the Board of directors to solicit third party indications of interest in acquiring all or any part of Paramount, nor have we actively sought any such offers.

PEx. 15 at P30368.

Appendix, Lazard included various valuation analyses and calculated relevant financial multiples of the merged corporation at various stock prices levels for both Viacom and Paramount. PEx. 12. Messrs. Rohatyn, Rattner and Ezersky discussed these materials with the board and answered the board's questions.

Finally, Paramount's counsel discussed the board's fiduciary duties and the legal standards governing their ultimate decision. PEx. 16 at P80392.

### C. Enter QVC

#### 1. Bidders Beware

After the September 12 board meeting, Messrs. Davis and Redstone announced publicly that Paramount was being "acquired," but clarified that Paramount was for sale only to Viacom. Viacom and Paramount affirmed their September 12 agreements by informing others, both publicly and privately, that other bids were unwelcome. At joint and separate press conferences, Paramount and Viacom issued statements clarifying their intent to consummate a transaction only with each other. QEx. 22 at 5 (Redstone, stating that the deal was a "marriage made in heaven ... [that would] never be torn asunder"); QEx. 77 (stating that only a "nuclear attack" could break up the deal). On September 16, Redstone and Davis issued a joint press release reaffirming their position that the proposed merger offered the "greatest long-term benefits to stockholders and audiences around the world," and that no other company could provide Paramount and Viacom what they could offer each other. QEx. 23 at V000402. On September 20, Messrs. Redstone and Davis issued another press release cautioning against a hostile bid. QEx. 25 at P71836.

In furtherance of the parties' intent to ward off other interested bidders, on September 14, Mr. Redstone called John Malone of TCI to discourage him from making a bid for Paramount. Malone Dep. at 87–88. He made a similar call to Mr. Diller. Diller Dep. 182–83.[12]

#### 2. QVC's September 20 Proposal and Responses

None of these admonitions deterred Mr. Diller. On September 20, Diller wrote a letter to Davis, proposing an acquisition by QVC of Paramount at a total package price of approximately $80 per share, consisting of 0.893 QVC share plus $30 cash for each Paramount share. QEx. 39 at V001298. The Diller letter stated that in addition to equity infusions by Comcast and Liberty Media of $500 million each, QVC had debt financing. Diller expressed QVC's readiness to meet to discuss a merger that would be subject to negotiations, stockholder approvals and regulatory clearances. *Id.* at V001299–1300.

QVC's proposal was hardly welcome news. That same day Paramount issued a press release stating that it believed "that a Viacom merger provides the best fit for the growth of our businesses [but that] the Board of [Paramount] will, in fulfillment of its responsibilities, evaluate the QVC proposal." QEx. 26 at V000401.[13]

After having heard nothing from Paramount for five days, Mr. Diller sent to Paramount a second letter reaffirming the availability of financing for QVC's proposal, and stating that "QVC will enter into a merger that does not contain any condition with respect to financing." QEx. 40 at V001296. Diller's letter also reaffirmed his willingness to meet and answer any questions of Paramount's board of directors.

##### a. The September 27 Meeting

On Monday, September 27, Paramount held a special board meeting to discuss

---

**12.** Three months earlier, in June, prompted by rumors of a hostile campaign by QVC, Mr. Davis had called Mr. Malone in June, specifically to ask him, as a QVC investor, to discourage QVC from making a bid. Malone Dep. at 73.

**13.** On September 21, Viacom and Paramount filed Premerger Notification and Report Forms pursuant to the Hart–Scott–Rodino Antitrust Improvements Act of 1976, which set in motion a thirty-day waiting period for consummating the transaction. QVC claims that that filing gave Viacom a timing advantage, since QVC could not commence the regulatory waiting period until a merger agreement or tender offer was executed or underway. At that point, the only merger agreement in existence was the Original Paramount–Viacom Merger Agreement.

QVC's proposal. After reporting events that had occurred since the September 12 meeting, Davis stated that as of Friday September 24, the QVC proposal had a market value of $83.80 per share, as compared to the Viacom deal market value of $65.45. PEx. 19 at P31487. Mr. Davis noted the interest of other potential bidders, including BellSouth and NYNEX, *Id.* at P31487–88, but said that Paramount was still proceeding with its agreement with Viacom. Mr. Davis pointed out that if Paramount did ultimately recommend a transaction with QVC, the Viacom lockup stock option and the $100 million termination fee would be triggered. *Id.* at 31490. Mr. Davis also told the board that the Original Merger Agreement prohibited Paramount from entering into discussions with QVC (or any other party) without evidence that the proposal is free of financing contingencies. *Id.* at P31487.[14] After discussion and review with its legal advisors, the board decided to consider QVC's offer once it received *satisfactory evidence* of financing.[15]

The directors were also furnished with materials from Paramount,[16] and Lazard, relating to QVC and its merger proposal. Lazard's written presentation, based on publicly available information, served as the basis for discussion. PEx. 20 at P0031494. The "Lazard book" included an overview of QVC from a financial point of view, a comparison of QVC and Viacom, an extensive workup of the QVC proposal, and a comparison of the QVC and Viacom transactions. PEx. 18. Lazard concluded that the QVC $80 merger proposal would provide $63.93 of value per share, and that the Viacom merger would yield $59.58 per share. *Id.* at P30892. Messrs. Rohatyn, Rattner and Ezersky made the presentations, and answered questions about QVC's and Lazard's comparison of the proposed transactions. PEx. 20 at P0031494.

b. *QVC's Proof of Financing and Paramount's October 11 Meeting*

On October 5, QVC delivered to Lazard's QVC's documentation of a $1 billion preferred stock investment by Comcast and Liberty Media, as well as six bank commitment letters for financing totalling $3 billion. In response, Paramount held a special board meeting on October 11, 1993 to discuss QVC's proposal.

After describing the QVC financing commitments, Mr. Davis discussed the board's duty to meet with QVC.[17] After discussion, the Paramount board then authorized management to meet with QVC. PEx. 22 at P0031506. Mr. Davis also informed the board that Booz–Allen & Hamilton ("Booz–Allen"), a management consulting firm, had been engaged to study the incremental earnings potential that would result from a Viacom–Paramount combination as compared with a QVC–Paramount combination. *Id.* at P0031505.

Despite the October 11 board authorization to enter into discussions with QVC, Paramount delayed and avoided meaningful dis-

14. Plaintiffs contend that that statement was plainly false, because the Original Merger Agreement required no such proof of financing. Rather, that Agreement allowed consideration of "an unsolicited written, *bona fide proposal, which is not subject to any material contingencies relating to financing.*" QEx. 1 at P72608–09 (Original Merger Agreement § 6.02) (emphasis added).

15. In that connection, Mr. Liedtke, one of the outside directors, testified that he told the board: "I had 20 guys out in West Texas I could bring up to New York and swear they had 10 billion dollars available any time they wanted, and I thought they [QVC] ought to have letters from the bank. That's the one thing that's non-controversial." Liedtke Dep. at 120–21.

16. Paramount management furnished the directors with copies of QVC's 1991 and 1992 Annual Reports, its Form 10–K for the 1992 fiscal year, its 10–K/A and 10–Q filed as of June 14, 1993, and the September 26 letter regarding QVC financing. PEx. 17.

17. No written materials were distributed at that meeting. Mr. Davis' script for that meeting stated that:

25. The merger agreement does not require us to further explore the QVC proposal. The Delaware law, however, does.
26. Lazard and Co. will draw on extensive business analysis similar to what we did in Viacom on what combined company will look like, its prospects, etc.
27. There are major issues that need to be looked into—regulatory constraints, the value of QVC stock, and the likelihood of consummating the transaction.
PEx. 21 at P0031501.

cussions with QVC. On October 12, Paramount requested that QVC sign a confidentiality letter agreement to enable it to receive confidential Paramount information. QEx. 95. In an October 13 letter from Mr. Oresman to Martin Lipton, QVC's outside counsel, Paramount requested various informational items.[18] On October 15, QVC similarly requested that Paramount sign a confidentiality letter agreement as a predicate to Paramount receiving confidential QVC information. QEx. 94. One week elapsed before Paramount returned the signed confidentiality agreement.

On October 20, QVC sent Paramount two binders of documents in response to Paramount's October 13 information request. Paramount acknowledged the receipt, and stated that it would review the materials and "be in touch" regarding negotiations. QEx. 43 (faxed at 4:19 p.m.). Mr. Lipton then faxed a letter to Paramount, stating that QVC was prepared to begin negotiations that day, or on the following two days. QEx. 44 (faxed at 4:20 p.m.). One hour later, Mr. Lipton faxed to Mr. Oresman, Paramount's general counsel, a second letter complaining that Paramount had done nothing but delay negotiating with QVC. Ex. 42. That evening, Mr. Oresman faxed another letter to Mr. Lipton, disputing his characterizations and responding that he (Oresman) would be in touch when Paramount was ready. QEx. 45 at V001285.

### 3. QVC's October 21, 1993 Tender Offer

Frustrated by Paramount's delay, on October 21, 1993, QVC filed this action and publicly announced a tender offer for Paramount shares. On October 27, QVC commenced that offer, and its terms were as follows: QVC would pay $80 in cash for 51% of Paramount's outstanding shares, and would acquire the remaining shares in a stock-for-stock second-step merger. In the merger, each Paramount share would be converted

into 1.42857 shares of QVC common stock valued at approximately $80.71 per share. QEx. 5 at 29 (October 27, 1993 QVC Offer to Purchase). QVC claims that it had no choice but to launch a hostile tender offer, because in the absence of a merger agreement a tender offer was the only means by which QVC could legally start the process of obtaining federal Hart–Scott–Rodino antitrust clearance.

### D. Viacom's Increased Bid

### 1. Negotiations with Viacom and the October 24 Board Meeting

In response to QVC's hostile offer, Viacom decided to increase its bid. During the weekend of October 23–24, 1993, Paramount and Viacom discussed a revised transaction. Viacom suggested a first step tender offer for 43.75% (later raised to 51%) of Paramount's outstanding shares at $80 per share, to be followed by a second step stock-for-stock merger of equivalent value. The end result was the Amended Merger Agreement between Paramount and Viacom. Redstone Dep. 222–23.

The Amended Agreements entered into on October 24 were essentially identical to the Original Agreements, except in the following respects:

1. The conversion ratio of the "second step" was changed so that each Paramount share would be converted into the right to receive: (a) .20408 share of Viacom Class A stock; (b) 1.08317 shares of Viacom Class B stock; and (c) 0.20408 shares of Viacom Merger Preferred Stock, a cumulative, convertible, exchangeable preferred series yet to be created. QEx. 3 at V001159–60 (Amended Merger Agreement § 1.06).

2. The Rights Plan provision was amended to provide that if the board concluded that a competing transaction offered shareholders a "better alternative," then the board would be entitled to refuse to amend the Rights

---

18. Those items included: a draft merger agreement; information on QVC's business, financial condition, operations and regulatory status; corporate governance and voting arrangements to which QVC is a party; additional financing materials; QVC's business plans for the use of Paramount's assets, including whether any spin-offs were contemplated; contemplated regulatory submissions and the estimated time before clearance; information on compensation plans; information relating to the current trading price of QVC stock; as well as other materials. QEx. 41 at 1–3.

Agreement in Viacom's favor, if not to do so would violate the board's fiduciary duties. QEx. 3 at V001184 (Amended Merger Agreement § 3.13.).

3. The termination provisions were amended to permit Paramount to terminate the Agreement if the board, in the exercise of its fiduciary duties when confronted with a competing offer, withdrew its recommendation of the Viacom transaction. QEx. 3 at V001217 (Amended Merger Agreement § 8.01(i)).

The Amended Stock Option Agreement retains the same option provisions, except that the amount of the Buy-out Alternative cash payment would be based on the price of the successful bid, rather than on the average of the market price of the five days prior.[19] QEx. 4 at V003848.

Paramount's board held a special meeting to discuss the revised Viacom proposal and the Amended Merger Agreement on Sunday, October 24, 1993. The directors were given summaries, prepared by management, of the Amended and Restated Merger, Stock Option and Voting Agreements,[20] and a one-page overview of the financial terms of the two competing transactions. Mr. Davis described the revised Viacom proposal, and pointed out that the amended agreement retained the lockups, but now included a "fiduciary out" provision that would enable the board to terminate the merger agreement before a shareholder vote. PEx. 26 at P31511.

The board was also furnished with a Lazard-prepared summary that compared the Viacom tender offer at $80 per share to the QVC-announced tender offer/merger proposal at $80 per share. PEx. 24 at P190246–51. In those documents Lazard stated that "using a weighted average 'unaffected' multiple, QVC stock would trade at $39, implying a per-share transaction price of *$68.10*," PEx.

24 at P190247, and that Viacom Class B stock, based on the same assumptions, would trade at $40.75, implying a per-share transaction value of *$70.75*. PEx. 24 at P19250. The minutes of the meeting recite that Messrs. Rohatyn, Rattner, and Ezersky opined that the revised Viacom tender offer and the related second step would be "fair to the stockholders of Paramount from a financial point of view." PEx. 26 at P31512. It appears that certain directors were concerned that the Viacom transaction might be coercive because only 43.75% of the shares would be acquired in the first step tender offer. During the course of the meeting, however, the directors were told that Viacom had decided to increase the percentage of shares acquired in the tender offer to 51%. PEx. 24 at P31512.

Next, Mr. Michael Wolf of Booz–Allen presented his firm's report on the value to shareholders that the proposed Viacom transaction would represent. The report concluded that based on cost reductions and revenue enhancements from existing and new potential businesses, the merger with Viacom would "create over $3BN [billion] more incremental shareholder value than a merger with QVC." QEx. 86 at P190267. In determining the differences in value creation between the two alternative mergers, Booz–Allen calculated the improved earnings potentials of the two contemplated transactions, using a 15x earnings multiple to each transaction. QEx. 86 at P190266. Plaintiffs argue that the Booz–Allen study should be given no weight, since Booz–Allen is not a financial analyst, and because Paramount never stated that its board relied upon the report in its public filings with the SEC. QOB at 46. In any event, the Booz–Allen report was self-described as a "first cut," QEx. 86 at P190266, and was not based on any nonpublic information about QVC that might bear on the value of future synergies.

---

19. In the Original Agreement, the cash sum to be paid to Viacom if it elected the Buy-out Alternative in lieu of exercising the option was to be calculated as the greater of either a five day average price of Paramount, or the offer price in a competing tender offer. QEx. 2 at P20080–81.

20. For convenience, these agreements will be distinguished from the September 12 agreements by the term "Amended". At this time the board also received copies of the term sheets for the Original Agreements.

Based on that information and the board's discussion at that meeting,[21] the directors approved the revised Viacom proposal and authorized the execution of the Amended Agreements.

No further discussions took place between Paramount and QVC prior to the execution of the October 24 Amended Agreements and the filing of Paramount's Schedule 14D–9 recommending the Viacom tender offer. QEx. 7.

### 2. QVC's Continued Attempts at Negotiations with Paramount

Viacom commenced its tender offer on October 25, and QVC launched its offer two days later. QOB at 50. On October 28 QVC wrote a letter to Paramount's board of directors, and again requested discussions concerning its proposal. QEx. 46. In response, Oresman informed QVC the next day that Paramount was willing to meet with QVC representatives. QEx. 47. A brief meeting between QVC's and Paramount's representatives took place on November 1. QVC presented a list of proposals entitled "Fair Bidding Process" for conducting the negotiations. QEx. 48. The list included provisions requiring Paramount (*inter alia*) to furnish the same business and financial information to both bidders, to use structural defenses and the poison pill nondiscriminatorily, not to enter into further similar arrangements with Viacom if the lockup option and termination fees were invalidated, to use the same merger agreement for both bidders, and to accept the best bid received by a certain deadline. QEx. 48. Paramount rejected those proposals and the meeting concluded. That same day, Mr. Oresman wrote a letter to QVC opposing any procedures amounting to an auction. QEx. 49.

### 3. Viacom Again Ups Its Bid

On Saturday November 6, Viacom, again unilaterally, raised its tender offer price to $85 cash for the 51% of Paramount's shares, plus a package of Viacom securities of equivalent value as the second step merger consideration. PEx. 36 (Paramount/Viacom 14D–1). In a telephonic board meeting held that day, Paramount's board considered Viacom's higher bid, and by unanimous written consent resolved to recommend it to Paramount's shareholders. PEx. 27.

### E. The Ball Shifts Again to QVC's Court
### 1. QVC Raises Its Bid

On November 12, the day after plaintiffs submitted their opening briefs, QVC increased its cash tender offer to $90 per share, with QVC securities of equivalent value to serve as the consideration in the second step merger. (Senior Aff. Ex. A at 2 (QVC Supplement to Offer To Purchase, November 12, 1993.)) Thus, QVC is now offering to purchase 51% of Paramount's outstanding shares for approximately $5.5 billion in cash. As for the remaining 49%, the second step merger would convert each share of Paramount common stock into 1.43 shares of QVC common stock plus 0.32 shares of new QVC convertible preferred stock. *Id.* at 2. QVC's purchase of tendered shares is conditioned, *inter alia,* upon the issuance of an injunction invalidating the Viacom stock option, and upon QVC's satisfaction that it has obtained sufficient financing to consummate the offer.[22] All other terms of QVC's $90 offer remain unchanged from their earlier tender offer. *Id.* at 1 (QVC Supplement to Offer To Purchase, November 12, 1993). The QVC transaction is valued at approximately $10.8 billion. At current market value, it exceeds Viacom's offer by approximately $1.3 billion. QVC Nov. 21 letter at 1.

---

**21.** The board discussed various issues related to the two proposals, including their fiduciary responsibilities, Small Dep. at 83; a Viacom/Paramount merger compared to QVC/Paramount merger in terms of the strategic fit with regard to Paramount's assets, Small Dep. at 191–92; PEx. 26 at P31512; the fairness of the consideration to be received by Paramount stockholders from the Viacom tender offer, PEx. 26 at P31512; Rattner Dep. at 156; the stock option and termination fee; PEx. 26 at P31512; Paramount's increased flexibility to terminate the merger agreement with Viacom, Pattison Dep. at 93.

**22.** QVC announced, in a November 20th press release, that although it is "not waiving the conditions to its offer, none of those conditions would any longer be in its sole discretion or judgment." VEx. Letter of David C. McBride, Esq., to the Court dated Nov. 21, 1993.

### 2. *Paramount Rejects QVC's Latest Offer*

In response to QVC's increased offer, Paramount scheduled a board meeting for November 15, 1993 to address the $90 QVC offer. In anticipation of that meeting, Paramount sent to the board members' homes and offices a three-page document which detailed the "Conditions and Uncertainties" of QVC's Offer without any mention of the financial terms of that offer. PEx. Nov. 19 letter at P31955. That summary emphasized management's view that the QVC offer was highly contingent, including (i) equity (Bell-South's nonbinding Memorandum of Understanding) and bank financing (lack, at that time, of commitment letters) uncertainties, (ii) the "possibility" that the transaction might not close until December 10,[23] (iii) antitrust issues concerning the involvement of Liberty and BellSouth, and (iv) the "Liberty make-whole" provision.[24] In Mr. Oresman's cover letter to this document he stated: "Here is a summary of the conditions and uncertainties of QVC's latest offer. We will be discussing them at the Board meeting." *Id.* at P31955. One director, Mr. Pattison, testified that this document created a negative impression of the QVC offer from the outset of the meeting: "My reaction was that this was not what I consider a live offer. It was full of contingencies and I would consider holes in it and I was very—*by the time I got through reading this, I was very negative on the whole subject.*" Pattison Nov. 20 Dep. at 7 (emphasis added).

In his presentation at the meeting, Mr. Davis further focused the board initially and primarily on the contingencies of the QVC offer. PEx. Nov. 19 at P32006 (Outline for November 15th Board Meeting). As a result, it appears that the board focused its attention on the contingencies of the QVC offer rather than the comparative economic merits of both offers. Fisher Nov. 19 Dep. at 35.

At the meeting itself, the directors were furnished with additional materials that served as the basis for oral presentations. The materials prepared by management included two comparisons of the Viacom and QVC offers, focusing on their respective terms and sources and conditions of financing. The comparisons provided to the board focused the board on the conditions of the QVC offer, but omitted disclosure of several similar conditions in the Viacom offer. PEx. Nov. 19 Letter at P31960–31971. For example, while QVC's condition that § 203 and the supermajority voting provision be made inapplicable is featured prominently in this comparison, no mention is made of the fact that the same condition applied to Viacom's offer. PEx. Nov. 19 Letter at P31964–66. The disproportionate emphasis on QVC's contingencies led the directors quickly to conclude that the offer was not even a "bona fide" proposal, and that they were therefore precluded (under the Amended Merger Agreement) from even considering it.[25] Furthermore, in contrast to their actions in September, the board simply rejected the QVC offer based on the financing conditions, rather than authorizing management, or the board's advisors, to seek information from QVC.[26]

---

**23.** The memorandum stated that the inclusion of BellSouth as a co-bidder on the deal might cause the SEC to require that QVC's offer be recommenced. PEx. Nov. 19 letter at P31958 ¶ 10. Plaintiffs argue, however, that Paramount had no basis for that conclusion.

**24.** As part of divesting Liberty's interest in QVC, as required by the FTC, QVC effectively granted to Liberty a right to require QVC to purchase Liberty's QVC shares, or to compensate Liberty if it must sell its QVC shares for less than $60 per share. PEx. Nov. 19 letter at P31957.

**25.** *See* Schloss Nov. 19 Dep. at 51 (stating of the financing and regulatory conditions: "I thought they had to be met before [the offer] could be considered"); Pattison Nov. 19 Dep. at 31 ("My understanding is that the board could not consider a proposition that had any financing contingencies attached to it because it would violate a firm reached agreement we had with Viacom."); *see also* Rattner Nov. 19 Dep. at 60–61 (regarding information available for the Lazard fairness opinion: *"Paramount concluded* that under the terms of the merger agreement with Viacom the QVC alternative proposal *did not constitute a bona fide proposal, and therefore we were prohibited from having discussions with QVC"*) (emphasis added).

**26.** *See* Schloss Nov. 19 Dep. at 20 ("The board decided that the QVC offer was too contingent to even consider and that *we did not have sufficient information to even determine the viability of the offer.*") (emphasis added).

No director suggested that inquiries be made to QVC to ascertain whether its financing conditions could be resolved, Schloss Nov. 19 Dep. at 74–77, and no director asked Lazard to discuss whether the QVC offer was financeable, although Lazard has testified that the deal was, at that time, likely financeable. *See* Rattner Nov. 19 Dep. at 67, 87.

In sum, although financing concerns were central to the board's rejection of the QVC proposal, the board did not request that management obtain more information from QVC regarding financing as it did at its September 27 meeting. Fischer Nov. 19 Dep. at 22–23. Instead, and with this limited data regarding the conditions of QVC's offer, the board simply followed management's lead in rejecting the unwelcome offer.

Lazard's brief board book and its written fairness opinion were the basis for a limited discussion of the financial merits of the two transactions. In addition to comparing the two deals "at face value," [27] Lazard calculated the respective deal prices on the basis of the same weighted average multiple analysis that it had performed earlier. Using the unaffected share prices, Lazard determined that the QVC offer (without the lockup) and the Viacom offer were valued at $80.01 and $74.29, respectively. PEx. Nov. 19 Letter at P31997.[28] However, on this occasion, when for the first time the Viacom offer came in at a lower valuation, Lazard stressed the "highly theoretical, nonpredictive" nature of the weighted average multiple analysis it used, cautioning that while it did use "unaffected share price," it did not encompass the long term synergistic or cost-saving effects of a particular merger.[29] Rattner Nov. 19 Dep. at 43. Moreover, Lazard failed to value the "back-ends" of the Viacom and QVC packages separately, but presented only "blended values."[30]

Lazard then submitted its written opinion, reiterating that the proposed Viacom transaction was financially "fair" to Paramount shareholders.[31] The opinion expressly cautioned that Lazard "was not expressing an opinion" regarding the QVC offer. PEx. Nov. 19 Letter at P31978 (Lazard Opinion). According to Mr. Rattner, Lazard was unable to express an opinion about the QVC offer, because it had been "prohibited" by Paramount from having discussions with QVC. Rattner Nov. 19 Dep. at 60–61.

In both its written and its oral presentations, Lazard also referred to certain information presented by Booz–Allen in its October 24th study. Lazard did not opine upon or quantify that information. Lazard did review certain of Booz–Allen's conclusions regarding the greater synergies realizable in a merger with Viacom, and speculated that those synergies might explain why Viacom's current market valuations of Viacom were greater than the implied weighted average multiple valuation for Viacom as calculated by Lazard. However, the Lazard report also noted that "the market has valued the combination [Paramount–QVC] more favorably than the Booz–Allen analysis would suggest." PEx. Nov. 19 Letter at P32000–01. Despite Lazard's comment upon these views, it is undisputed that neither Lazard nor Booz–

27. The respective market prices of the Viacom and QVC offers were $80.56 and $89.74 as of 3:00 p.m. on November 15. PEx. Nov. 19 letter at P31972.

28. In his November 19 deposition, Mr. Rattner testified that the figures shown to the board on November 15 were factually erroneous, and were subsequently revised internally at Lazard on November 19. The correct values (he testified) were $73.49 and $74.97 per share for Viacom and QVC (without lockup) respectively, only $1.48 apart. This information, however, was not available to the Board at the November 15th meeting. Rattner Nov. 19 Dep. at 29–32, Rattner Nov. 19 Dep.Ex. 6 at 10.

29. Lazard warned that, "while this analysis may be useful, it is not intended and cannot be relied upon to predict actual stock trading values." PEx. Nov. 19 Letter (Lazard Book) at P31996.

30. Plaintiffs suggest that this is because such an analysis demonstrates that the Viacom offer is significantly "front end loaded", with a front end value of $85, but a "back end" of only $75.94. QVC Nov. 21 Letter at 5. The QVC "back end", in contrast, is valued at $88.57, with a $90 front end. *Id.* at 1–2.

31. Again, as with the September 12 fairness opinion, the November 15 Lazard opinion clearly indicates that Lazard was not asked to conduct a "market check", nor had they done so. PEx. Nov. 19 Letter at P31977. (Lazard Nov. 15 fairness opinion.)

Allen provided the board with any information that would support quantitatively the conclusion reached by the board that a Paramount–Viacom merger would create higher long-term value than the QVC alternative.[32]

Based on their purely qualitative view that the Viacom transaction would provide greater benefit to shareholders in the long run, the board determined that the QVC offer "[was] not in the best interests of Paramount and its shareholders." Paramount Schedule 14D–9 at 1 (November 16, 1993).

On November 19, Mr. Diller wrote to the Paramount Board informing them that QVC had obtained full financing commitments sufficient to evidence that QVC's offer was not "highly conditional." Diller Nov. 19 Letter at 1. Included as supporting documentation were commitment letters from the same six banks that had backed QVC's merger proposal, and a binding commitment from Bell-South with respect to their equity investment. *Id.* Diller also mentioned in that letter that the Hart–Scott–Rodino waiting period for the QVC offer had been terminated by the FTC and that "there [was] no longer any FTC issue." *Id.* Thus, as of the November 15th Paramount board meeting, QVC was, in fact, very close to eliminating some of the conditions and uncertainties that motivated the board's decision not to even consider the QVC proposal. But in reliance on management's information and characterization of QVC's offer as illusory or too contingent to be taken seriously, the board failed to obtain additional information necessary to test whether that characterization was correct.

## II. THE CONTENTIONS AND THE APPLICABLE INJUNCTIVE STANDARD

The pending motions arise out of a contest for control of Paramount between two bidders—Viacom and QVC. What drives these motions is that (i) the Viacom offer is scheduled to close seven days before the QVC offer, and (ii) that the Paramount board has taken actions that QVC claims will (unless enjoined) prevent QVC's offer from being considered by Paramount's shareholders fairly and on an equal footing. Those actions include the board's refusal to amend the Rights Agreement and to defuse other anti-takeover mechanisms so to make them inapplicable to the QVC offer, and the board's agreement to the lockups (*i.e.,* the termination fee and stock option) as part of the contractual arrangements with Viacom.

To understand the import of the parties' contentions, it is helpful first to discuss the relief being requested, which involves describing the mechanisms against which the requested relief is being sought.

### A. *Description of the Relief Requested*

The primary relief being sought is an injunction against the consummation of the Viacom tender offer. In addition, the plaintiffs seek the invalidation of, and relief against, the "lockup" agreements, the Paramount Rights Agreement, and other anti-takeover mechanisms that are described below.

### 1. *The Rights Agreement*

The Paramount Rights Agreement (the "Rights Plan"), adopted in 1988, distributed to all shareholders one Right per share, exercisable only upon (1) the acquisition by any person or affiliated group of 15% of the outstanding shares of Paramount, or (2) the commencement of a tender offer for 30% or more of the outstanding shares. QEx. 5 at

---

**32.** *See* Rattner Nov. 19 Dep. at 10 ("We did not offer any opinion regarding long term values."); Pattison Nov. 20 Dep. at 78 (recalling no discussion of long term value by Lazard).

It appears that directors relied on the Booz–Allen report and their own intuitions without any quantified measure of the relative long-term benefits of each offer. Mr. Pattison testified:

Q: Did you have any basis for knowing what the stock of a combined Paramount Viacom will be a year from today?

A: No, but based on everything that I read to do with Viacom and QVC of my own independent assessment, plus the fact that we had some input in a presentation from Booz–Allen, plus the fact that I have been around this company for five years where we have talked to many other entities about trying to do something to build a long term strategic value; that it was the best judgment as a director....
Pattison Nov. 20 Dep. at 34.

32–3. Upon exercise, each Right entitles the holder to purchase, for $200, that number of Paramount shares (or shares of the acquiring entity in a merger where Paramount is not the surviving entity) having a market value of twice the purchase price ($400).[33] *Id.* at 33. Rights held by an "acquiring person" or entity are null and void and cannot be exercised. *Id.*

In both the September 12 and the October 24 Merger Agreements, Paramount contractually committed to amend the Rights Plan to make it inapplicable to the Viacom transaction. QEx. 3, at § 3.13(a). However, the Paramount board is not required to make those amendments if there is outstanding another tender offer or merger agreement that the board believes is a better alternative, and if the board is advised by legal counsel that "lifting" the pill against Viacom would be inconsistent with its fiduciary duties. *Id.* QVC's Offer to Purchase is conditioned upon the Rights being redeemed before the closing of the QVC Tender Offer, or otherwise made inapplicable to that Offer. Otherwise, it will require stockholders to tender one Right for each tendered share. QEx. 5 at 5, 34.

The plaintiffs ask this Court to order the defendants to take all steps required to make the Rights Plan inapplicable to QVC, or, alternatively, to enjoin the Paramount board *pendente lite* from exempting Viacom from the Rights Plan's coverage.

### 2. *The Termination Fee*

Under the Merger Agreement, Viacom is entitled to receive from Paramount a $100 million termination fee if the Merger Agreement is terminated because of a competing bid or transaction, or if the Paramount stockholders do not approve the Agreement. The plaintiffs seek the invalidation of the termination fee and an injunction against its payment to Viacom.

### 3. *The Stock Option*

The Merger Agreement also provides that if Paramount is acquired by a company other than Viacom, Viacom will be entitled, at its election, either (1) to purchase 19.9% of Paramount's outstanding stock (23,699,000 shares) at $69.14 per share (the original Viacom deal price), or (2) to receive from Paramount in cash a sum equal to the amount by which the successful acquiror's price exceeds $69.14 per share, multiplied by the number of shares Viacom receives under the Stock Option Agreement (the "Buy-out Alternative"). That amount would equal 16.7% of the amount by which the higher (successful) bid exceeds $69.14 per share.

Viacom may choose to exercise the stock option by paying in cash only the par value of the stock ($1 per share), or $23,699,000. As for the remaining $68.14 per share, or over *$1.6 billion,* of the exercise price, Viacom may pay with senior subordinated notes of its subsidiary, Viacom International, Inc. The notes would mature in seven years and bear an interest rate, agreed to by Paramount and Viacom, such that the notes would trade, when issued, at a price equal to their principal amount. However, the notes cannot be converted into cash unless registered, and in the Stock Option Agreement Viacom has undertaken, in specified circumstances, to cause the notes to be registered.

At current bidding levels, the stock option will be worth approximately $500 million to Viacom if QVC is the successful bidder. Plaintiffs request the Court to invalidate the stock option and enjoin its exercise by Viacom.

### 4. *Other Antitakeover Mechanisms*

The Merger Agreement requires the Paramount board to cause the Viacom transaction to be exempted from the operation of 8 *Del.C.* § 203 (which restricts the ability of certain acquirors of corporate control from effecting certain corporate combinations without board approval), and from Paramount's 80% "supermajority" shareholder voting requirement of Paramount's charter to approve a merger and other specified transactions. Regarding these mechanisms,

---

**33.** The Rights are redeemable by Paramount up until they become exercisable, for $.01 per Right.

QEx. 5 at 34.

QVC seeks an injunction directing the board to apply them to its proposed transaction on the same basis that they will be applied to Viacom's.

### B. *Standard for Injunctive Relief*

To prevail on their motion for a preliminary injunction, the plaintiffs must demonstrate a reasonable probability of success on the merits, irreparable harm that will occur absent the injunction, and that the balance of equities or hardships favors the grant of injunctive relief. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr. 506 A.2d 173, 179 (1985) ("*Revlon*"); *Ivanhoe Partners v. Newmont Mining Corp.*, Del. Supr., 535 A.2d 1334, 1341 (1987); *Robert M. Bass Group, Inc. v. Evans*, Del.Ch., 552 A.2d 1227, 1238 (1988). The plaintiffs contend that their motions satisfy these standards; the defendants argue that they fail on all counts.

### C. *The Plaintiffs' Fiduciary Duty Contentions*

The plaintiffs claim entitlement to the requested relief on the ground that the board's agreement to the lockups; and its discriminatory deployment of the Rights Plan, super-majority provision and the board's powers under § 203, constituted breaches of the board's fiduciary duties in three major respects. The plaintiffs also contend that Viacom aided and abetted those fiduciary duty breaches.

*First,* the plaintiffs claim that when the board committed itself to a transaction that would involve a change of voting control from Paramount's public stockholders to Mr. Redstone, it became subject to the duties articulated in *Revlon* and its progeny. Those duties, plaintiffs argue, required the board to obtain the highest immediately available value for the corporation's shareholders and not to erect obstacles that would obstruct that goal.

The plaintiffs contend that QVC's proposal offers the highest value, and that Paramount's directors, through their deployment of the Rights Plan, lockups, and related anti-takeover mechanisms, are attempting to preclude Paramount's shareholders from accepting QVC's higher offer and to force them to surrender control to Mr. Redstone by coercing them into accepting Viacom's inferior offer. That will occur, plaintiffs argue, because the Rights Plan, if consummated, will dilute the QVC offer massively, thereby significantly increasing QVC's acquisition costs. The lockups would also have a dilutive effect by diverting to Viacom $600 million of value that would otherwise flow to Paramount's shareholders, and also by potentially diluting QVC's stock interest, after the tender offer, below the 50% level. Exacerbating that diversion would be the impact on Paramount's capital structure if Viacom were to exercise the stock option and pay for it with a $1.6 billion so-called "junk bond" illiquid note. Plaintiffs argue that the result would be to substantially reduce the value of the merged entity to any bidder competing with Viacom. Plaintiffs argue that to avoid the risk that the QVC offer would not be consummated, Paramount stockholders will stampede to tender into the more certain, even though presently lower-priced, Viacom deal in the belief that a lower-priced bid in the hand is preferable to a higher priced one in the bush.

*Second,* the plaintiffs contend that the board failed to observe its fiduciary duties to exercise due care and make an adequately informed decision, as delineated in *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858 (1985) ("*Van Gorkom*") and elaborated in *Cede & Co. v. Technicolor, Inc.*, Del.Supr., 634 A.2d 345 (1993) ("*Technicolor*"). Plaintiffs claim that the Board violated that duty by entering into (and "locking up") a control-shifting transaction without ascertaining by some appropriate form of "market check," or otherwise, whether the Viacom bid represented the highest available value for the company. Plaintiffs argue that it did not, as evidenced by Viacom itself having twice raised its bid. Moreover, the plaintiffs claim that the board twice approved the Viacom deal(s) at hastily called meetings without the benefit of significant written materials, and without the benefit of critical facts that the management directors knew but failed to disclose. That occurred, plaintiffs argue, because the outside directors failed adequately to supervise management by not setting ground rules as to price, structure, future strategies, and oth-

er material terms in advance of any negotiations.[34]

*Third,* the plaintiffs contend that the board's actions in approving the October 24, 1993 Amended Merger Agreement (including its continuation of the lockups) and the board's refusal to "lift" the Rights Plan in connection with QVC's offer, were defensive measures, reactive to QVC's initial tender offer, that must satisfy the enhanced level of scrutiny mandated by *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985) (*"Unocal"*). *Unocal* requires that the directors demonstrate that they reasonably perceived QVC's proposal as representing a threat to corporate policy and effectiveness, and that the measures they took in response were reasonable and proportionate in relation to the threat. *Id.* at 955–56. It is claimed that the defendants' actions cannot satisfy that standard, because both QVC's initial proposal, which exceeded Viacom's by $2 billion, and its present proposal, did not and still do not constitute a material threat to Paramount and its stockholders.

Plaintiffs further argue that even if QVC's proposal were deemed a threat, the board's responses to it were unreasonable and disproportionate. Their argument runs as follows: The $100 million breakup fee and 20% lockup stock options are unprecedented both in their size and their preclusive effect. For the board to agree to these lockups on September 12 was unreasonable, because they were not needed to induce Viacom to bid, nor were they reasonably calculated to increase shareholder value.[35] Rather, their sole purpose was to deter a potential competing bidder—specifically QVC, which the defendants knew or had good reason to believe would soon be bidding for Paramount. Nor was it reasonable for the board to perpetuate the lockups in the October Agreements, because the lockups were not needed for Viacom to increase its bid or to protect Paramount against any inadequate or coercive competing offer. The Rights Plan afforded sufficient protection in that regard. It was also unreasonable for the board to respond to QVC's proposal, to QVC's subsequent Tender Offer, and to QVC's attempts to negotiate, by refusing to meet with QVC while at the same time approving Viacom's lower-priced coercive two-step acquisition. Finally, the plaintiffs argue that the board's stated intention to "lift" the Rights Plan and other antitakeover structural defenses for Viacom, but not for QVC, is disproportionate and, therefore, unreasonable.

### D.  *The Defendants' Contentions*

The defendants dispute the plaintiffs' accusations by insisting that the Paramount directors acted diligently and were fully informed throughout. They contend that the board's decision to endorse the original Viacom transaction and its later evolutions, and to rebuff the QVC proposals, were disinterested, reasoned business judgments made honestly and in good faith. Defendants insist that the proposed combination with Viacom represents the fulfillment of a longstanding business strategy, fully endorsed by Paramount's board, to become one of the world's leading sources of entertainment, books, and educational materials, and that the Viacom transaction will achieve for Paramount's stockholders both immediate short-term value and increased long-term value due to the synergies created from a combined world-class publishing and entertainment colossus. Moreover, the Paramount board has contractually reserved to itself the right to terminate the Viacom transaction if the board receives a proposal that it deter-

---

**34.** The plaintiffs also claim that the directors breached their duty of loyalty by approving a lower-priced transaction with Viacom to which Davis would consent only because Viacom agreed that he would become the CEO of the post-merger entity. That argument is without merit, because there is no claim or showing that the independent Paramount directors had any personal self-interest in a transaction with Viacom, or that securing Davis' tenure was their motive for approving the Viacom transaction. *Technicolor,* at 363. ("This Court has never held one director's colorable interest in a challenged transaction is sufficient, without more, to deprive a *board* of the protection of the business judgment presumption of loyalty.")

**35.** Indeed, plaintiffs contend, the Agreement gave Viacom an incentive to make as low an initial bid as possible, by structuring the lockups to reward Viacom the difference between its initial $69.14 deal price and the amount of the prevailing competing bid.

mines is better for the shareholders. That right has not been exercised, it is claimed, because the QVC proposals do not represent a better transaction.

The defendants advance several reasons why the Viacom transaction is superior to that currently being proposed by QVC. Defendants claim that the Viacom transaction is the end product of a five-year search for a partner that most suitably fits Paramount's long-term business strategy. Based upon management's own research and the analysis and advice given by its financial advisors, the board concluded that the range of arguably suitable merger candidates was narrow. Of these, Viacom was selected as the most suitable. Given the businesses that both Paramount and Viacom would contribute to a combined enterprise, and the synergistic and growth opportunities that a Paramount–Viacom combination would offer, Mr. Davis and Paramount's board concluded that that combination was one "between equals" and "made in heaven."

The defendants argue that even if the QVC transaction offers greater immediate value, it will not afford shareholders the long-term benefits and value inherent in a combination with Viacom. Several reasons are advanced: (i) QVC brings only one line of business to a merger (a home shopping program), few hard assets and no strategic plan; (ii) the shareholders would be investors in a company consisting mostly of Paramount assets that would not generate sufficient earnings to sustain the $90 acquisition price; (iii) much of the value of the "back-end" of QVC's proposed deal is due to the market's perception of one man—Barry Diller—and of QVC's

prospects of acquiring Paramount; and (iv) the QVC offer is "illusory" because it is subject to several conditions that QVC "in its sole discretion" must be satisfied have been fulfilled. Indeed, defendants say, QVC may not even be committed to the terms of the proposed "back-end" merger, and can walk away if it so chooses. Viacom, by way of contrast, is contractually bound to complete its proposed transaction.

That being the case, the defendants claim that (a) the board may reject the QVC proposal, despite its higher present market value, on the basis that the Viacom transaction affords value not reflected in the stock market price; (b) the board may protect that transaction by selectively using the poison pill and other antitakeover mechanisms, even if the result is to preclude shareholders from choosing the QVC proposal, and (iii) the lock-up agreements are lawful because they were granted to induce Viacom to make an initial bid, are reasonable in their magnitude, and have not deterred any competing bidder.

Expressed in terms of Delaware case law, the defendants' position is that this case is governed not by *Van Gorkom, Revlon,* or *Unocal,* but by *Paramount Communications, Inc. v. Time Inc.,* Del.Supr., 571 A.2d 1140 (1990), *aff'g, Paramount Communications, Inc. v. Time Inc.,* Del.Ch., C.A. No. 10866, 10670, 10935, Allen, C., 1989 WL 79880 (July 14, 1989) *("Time").*[36] These facts are not controlled by *Van Gorkom,* defendants say, because the directors were at all times fully informed and attentive to their duties. And they are not controlled by *Revlon,* because Paramount did not put itself up for sale,[37] initiate an active bidding process,

---

**36.** In *Time,* this Court and the Supreme Court upheld the decision of the board of the target corporation (Time Incorporated) to reject and defend against an unsolicited cash tender offer by a competing bidder (Paramount), in favor of a pre-existing combination with the favored bidder (Warner Communications), even though the hostile bid was for a cash price higher than the market value of the cash and stock in the Time–Warner combination. The directors justified their action on the basis that the pre-existing strategic transaction with Warner would afford to shareholders higher long-term value (which was not then adequately valued by the stock market) than the short-term value of the Paramount tender offer. This Court, and later the

Supreme Court, determined that in the circumstances of that case, the board was not subject to the duties imposed by *Revlon,* that its actions were reasonable responses to Paramount's hostile offer (under *Unocal* ), and that its determination that the Warner transaction was in the best interests of the corporation was sustainable under the business judgment standard of review.

**37.** In response, plaintiffs contend that Paramount did put itself up for sale, and cite the parties' own verbal descriptions of the transaction in support. For example, Mr. Davis stated that Paramount was "being acquired" in a September 13 press conference, QEx. 22 at 21. He wrote to shareholders on September 17 that Via-

or abandon a long-term business strategy by seeking or effecting a reorganization or other transaction involving the breakup of the company. Paramount also argues that a change of control, without more, is insufficient to trigger *Revlon*, because Paramount's shareholders will experience no liquidation of their interests and will have a significant continuing interest in the merged entity.

Finally, the defendants urge that *Unocal* does not apply because the September 12th agreements were not defensive responses to QVC, whose proposal did not surface until September 20. For that reason the lockup agreements must be evaluated under the business judgment standard of review, and on that basis must be sustained. Defendants contend, however, that even if *Unocal* is applicable to the October 24 Amended Agreements, the lockups must be viewed as reasonable and calculated to further the interests of Paramount's stockholders.[38]

Lastly, defendants argue that the motions must be denied, because a denial of relief will not irreparably harm QVC, but an injunction would risk causing greater harm to Paramount's shareholders.[39] Both arguments rely on the proposition that QVC's offer is so conditional and speculative that it cannot be

taken seriously, and that if the Viacom transaction is preliminarily enjoined, that would create the risk of shareholders losing the only transaction solidly in hand (*i.e.*, with Viacom) and ending up with nothing.

## III. *THE FIDUCIARY DUTY IMPLICATED HERE*

### A. *Applicability of Revlon*

■ The parties devote considerable attention in their briefs to the issue of whether the board's agreement(s) to combine Paramount with Viacom triggered duties under *Revlon*. The question they present is whether *Revlon* duties are "triggered" when a corporate board commits the corporation to a transaction, however structured, involving a sale or transfer of control. Our cases do not unambiguously answer that question when posed in that stark, unembroidered form. Before the Supreme Court's decision in *Time*, certain authorities contained language that supported the proposition that a change of corporate control triggers duties under *Revlon*. *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261 (1988) ("*Macmillan*");[40] *Barkan v. Amsted Industries*, Del. Supr., 567 A.2d 1279 (1989) ("*Barkan*").[41]

com "will acquire Paramount," QEx. 24 at P190143; Mr. Redstone wrote two memoranda to Viacom employees that he was pleased to announce that Viacom would acquire Paramount, QEx. 68 at V006893 (memo of September 13), V006898 (memo of September 29); the two companies issued a joint press release on September 12 stating that Viacom would acquire Paramount, QEx. 21 at P30824.

**38.** Defendants claim that all of the board's actions after QVC's unsolicited tender offer (announced on October 21) were reasonable because (a) on October 24 the board negotiated a new agreement with Viacom that significantly increased the transaction price—one superior to QVC's even from a short-term financial viewpoint; (b) in those circumstances the board was not required to surrender or to force Viacom to forfeit the termination fee and stock options, and thereby place at risk the entire revised (and significantly improved) transaction; and (c) the board is entitled to keep the poison pill in place to protect its shareholders against a competing offer that in the directors' good faith, disinterested judgment, was economically inferior, highly conditional, and coercive.

**39.** Viacom also advances the separate argument that plaintiffs have failed to adduce that it aided

or abetted any fiduciary violation by Paramount directors, and that in those circumstances, the Court cannot (or, alternatively, should not) grant relief that would deprive Viacom of its bargained-for contractual rights.

**40.** In *Macmillan* the Supreme Court said:

As we held in *Revlon*, when management of a target company determines that the company is for sale, the board's *responsibilities* under the enhanced *Unocal* standards are significantly altered. *Revlon*, 506 A.2d at 182. Although the board's *responsibilities* under *Unocal* are far different, the enhanced *duties* of the directors in responding to a potential shift in control, recognized in *Unocal*, remain unchanged. This principle pervades *Revlon*....
*Macmillan*, 559 A.2d at 1287 (emphasis in original).

**41.** In *Barkan*, the Supreme Court stated that:

We believe that the general principles announced in *Revlon*, in *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985), and in *Moran v. Household International, Inc.*, Del.Supr., 500 A.2d 1346 (1985) govern this case and *every case in which a fundamental change of corporate control occurs or is contem-*

However, in its opinion in *Time,* the Supreme Court articulated a different formulation of the circumstances that trigger duties under *Revlon,* describing them as follows:

> Under Delaware law there are, generally speaking and without excluding other possibilities, two circumstances which may implicate *Revlon* duties. The first, and clearer one, is when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear breakup of the company. *See, e.g., Mills Acquisition Co. v. Macmillan, Inc.,* Del.Supr., 559 A.2d 1261 (1988). However, *Revlon* duties may also be triggered where, in response to a bidder's offer, a target abandons its long-term strategy and seeks an alternative transaction involving the breakup of the company.

*Time,* 571 A.2d at 1150 (footnote omitted).

It has been argued, in this case and elsewhere, that the Supreme Court's reformulation of *Revlon*-triggering circumstances in *Time* has narrowed the universe of *Revlon*-triggering events and eliminated "change of control" from that universe. In *In re Wheelabrator Technologies, Inc. Shareholder Litigation,* Del.Ch., C.A. No. 11495, Jacobs, V.C. (Sept. 1, 1992) at 13–16, 1992 WL 212595, this Court noted the debate on that issue, but found it unnecessary to resolve it. The parties invite the Court to revisit that question.

Time constraints do not permit an elaboration of the multitudinous and well-reasoned arguments advanced by both sides on that issue. Suffice it to say that the Court has considered those arguments, and concludes that it is unnecessary and inappropriate to resolve that question on a doctrinal level. That resolution must await another day. For whether or not one subscribes to the categorical proposition that a change in control will in all circumstances trigger duties under *Revlon,* in these peculiar circumstances this change of control transaction should have that effect.

The critical circumstances are these: the Paramount board has committed the company to a transaction that will shift majority voting control from Paramount's public shareholders to Mr. Redstone. The defendants concede that this sale of control entitles those shareholders to a control premium; indeed, they emphasize that the Viacom transaction affords such a premium. But QVC has now entered the fray and has offered Paramount's shareholders an opportunity to sell control to it for what (as matters presently stand) appears to be higher immediate value, *i.e.,* a larger premium. The Paramount board is not permitting the shareholders to choose between these two alternatives. Rather, by its selective deployment of the poison pill and other antitakeover structural devices to favor Viacom and disfavor QVC, the Paramount board would effectively force shareholders to tender into the lower-priced Viacom transaction.

Under what fiduciary principle may the board do that? The defendants say that their conduct is explicitly permitted under *Time,* because the Viacom transaction will carry out a preexisting strategy, will afford higher long-term value to shareholders, and will be in the corporation's best long-run interests. Under those circumstances, the directors argue, they have no duty to abandon a deliberately conceived corporate plan in favor of a short-term shareholder profit. Rather, they do have a fiduciary duty to manage the corporation in the proper exercise of their business judgment, and that obligation is what justifies their chosen course of action. *See Time,* 571 A.2d at 1154. More specifically, defendants argue, *Time* holds that they are not subject to *Revlon* duties, and if this Court were to hold otherwise, that would discourage Delaware corporations from entering into valuable strategic combinations such as the one at issue here.

I cannot agree. *Time* did not involve the circumstances presented here. Those circumstances implicate the fiduciary and fairness concerns that underlie and inform *Revlon, Unocal,* and *Macmillan.*

*Barkan,* 567 A.2d at 1286 (emphasis added) (citations and footnote omitted).

■ From the standpoint of an equity investor, few events in the life of a corporation are as significant as a change in corporate control. All parties agree that when that occurs, the owners of control are entitled to a control premium and, normally, to the highest premium their controlling interest will command in the marketplace. The attainment of such a premium is not problematic where control rests in the hands of one stockholder or a cohesive stockholder group, for in those cases the most advantageous premium will be negotiated and bargained for by the controlling shareholders themselves. Even where (as here) control rests in the hands of a "fluid aggregation of unaffiliated shareholders representing a voting majority," *Time*, 571 A.2d at 1150, the market mechanism should achieve the same result, at least where the transaction is structured so as to allow the shareholders to choose for themselves (*e.g.*, a tender offer or merger).

But here the directors are using their powers to prevent the shareholders from making that economic choice. They seek to justify that conduct on the grounds that the Viacom transaction is the better transaction for the shareholders, even though it may not be as valuable in the short term, and that given the complex character of the transaction consideration offered in each, the directors are in the best position to make that determination. The plaintiffs respond that the directors may not under any circumstances exercise their power so as to preclude shareholder choice.

But I need not address the plaintiffs' proposition here. For if it may be assumed that directors may, in certain instances, exercise a power to choose what premium the shareholders will receive in a change of control transaction, then those directors, as fiduciaries, must be deemed to have assumed the duty that accompanies the power. In colloquial terms, that duty is to do for the shareholders what the shareholders would otherwise do for themselves—to seek the best premium-conferring transaction that is available in the circumstances. Fairness requires no less. *See Barkan*, 567 A.2d at 1287 ("the best possible transaction for shareholders"); *In re Fort Howard Corporation Shareholders Litig.*, Del.Ch., C.A. No. 9991, Allen, C.,

(Aug. 8, 1991) at 1–2, 1988 WL 83147 (directors must "search, in good faith and advisedly, for the best available alternative"); *Roberts v. General Instrument Corp.*, Del. Ch., C.A. No. 11639, Allen, C. (Aug. 13, 1990) slip. op. at 18, 1990 WL 118356 (the "best available alternative for the corporation and its shareholders").

■ What is at risk here is the adequacy of the protection of the property interest of shareholders who are involuntarily being made dependent upon the directors to protect that interest. In such circumstances fairness and our law require that the directors' conduct be made subject to the enhanced judicial scrutiny mandated by our Supreme Court in cases such as *Unocal*, *Revlon*, *Macmillan*, and *Gilbert v. El Paso Co.*, Del.Supr., 575 A.2d 1131 (1990). Those authorities require, in transactions involving a change of corporate control, that the directors must satisfy the Court of the reasonableness of their actions before those actions will merit the protection of the business judgment rule.

This reasoning impels me to conclude that the fiduciary and fairness concerns that underlie *Revlon* and its progeny exist in this case as well. For that reason, the *Time* decision does not control these facts. In *Time* there was no change of control. Here there is.

The defendants insist that that distinction is unimportant, because *Revlon* has been applied in cases, such as *Macmillan* (and even *Revlon* itself), involving "cashout" transactions where the shareholders were being eliminated from the enterprise. Here, the defendants argue, the shareholders will have a continuing equity interest in the combined Paramount–Viacom entity.

To this argument there are two answers. The first is that *Revlon* has been applied in stock, as well as in all-cash, transactions. *See Barkan, supra; Macmillan*, 559 A.2d at 1285 (referring to the restructuring enjoined in *Robert M. Bass Group, Inc. v. Evans*, Del.Ch., 552 A.2d 1227 (1988)). The second is that the shareholders' continuing equity interest is far from secure, because once the Viacom transaction is complete Mr. Redstone will have absolute control of the merged enti-

ty and will have the power to use his control at any time to eliminate the shareholders' interest by a "cash out" merger. In this case the board did not obtain, or even bargain for, structural protections that would ensure the continuity of Paramount's current shareholders (or their successors) in any merged enterprise.[42] Absent such protection, these shareholders can have no assurance that they will receive the long-run benefits claimed to justify the board's decision to prefer Viacom over QVC. This is the only opportunity that Paramount's shareholders will ever have to receive the highest available premium-conferring transaction. For this reason as well, fairness requires that the shareholders be afforded the fiduciary protections mandated by *Revlon* and *Unocal.*

The "bottom line" of this analysis is that from and after September 12 the directors of Paramount have been subject to the duties prescribed by *Revlon.* But that conclusion only raises the next issue, which is: what, precisely, were those duties in this case? To that question I now turn.

### B. *What Revlon Duties Entail In This Case*

The Court suspects that what underlies the heated disputations over whether *Revlon* applies is the concern that its application will force firms such as Paramount to be placed on the auction block, and limit the ability of directors to carry out their charge of deciding what is in the corporation's best long-term interests. More broadly, the defendants are concerned—and pointedly argue— that if *Revlon* is found applicable, it will discourage directors from steering their corporations into beneficial strategic combinations essential to compete in an increasingly global economy. In this Court's view, those concerns are overstated. Delaware corpora-

tions should be and are free to enter into strategic combinations. If *Revlon* in any way restricts that freedom, it is only to the extent necessary to assure that the fundamental interests of the corporation's equity investors are protected.

*Revlon* and *Unocal* do not represent any departure from bedrock fiduciary principles. They are simply particularizations of those principles in the important context of a change of corporate control. As our Supreme Court stated in *Barkan,* "the rule in *Revlon* . . . did not produce a seismic shift in the law governing changes of corporate control," because *Revlon* is "derived from fundamental principles of corporate law and flows directly from precedents such as *Unocal.*" *Barkan,* 567 A.2d at 1286, n. 2. The basic teaching of *Revlon* and *Unocal* "is simply that the directors must act in accordance with their fundamental duties of care and loyalty." *Id.* at 1286.

Both *Revlon* and the fundamental duty of due care require that the directors establish that their decision was adequately informed,[43] *i.e.,* that they acted on information that

> affords a disinterested and well motivated director a basis reasonably to conclude that if the transaction[ ] contemplated by the merger agreement close[s], they will probably represent the best available alternative for the corporation and its shareholders.

*Roberts,* slip. op. at 18. "The need for adequate information is *central* to the enlightened evaluation of a transaction that a board must make." *Barkan,* 567 A.2d at 1287 (emphasis added). There is no single method or blueprint that a board must employ to acquire such information. *Id.* What must be done depends upon the circumstances.

> . . . [T]he due care theory and the *Revlon* theory do not present two separate legal theories justifying shareholder liability. . . . [B]oth theories reduce to a claim that the directors were inadequately informed (of alternatives, or of the consequences of executing a merger and related agreements).
>
> *Technicolor,* at 370, n. 37 (quoting *Cinerama, Inc. v. Technicolor, Inc.,* Del.Ch., C.A. No. 8358, Allen, C. (June 21, 1991 revised, June 24, 1991), at 39, 1991 WL 111134).

---

**42.** For example, there is no provision requiring approval of a cash-out merger by a majority of the minority stockholders and/or the approval by a special committee of directors. *See, e.g., In re TWA Shareholders Litigation,* Del.Ch., C.A. No. 9844, Allen, C. (Oct. 21, 1988); *Citron v. E.I. Du Pont de Nemours & Co.,* Del.Ch., 584 A.2d 490 (1990).

**43.** As observed in *Technicolor:*

Thus, an auction is one way of obtaining information, as is a canvass of the market, but neither is categorically required by the *Revlon* doctrine. Directors may approve a transaction without employing either method, so long as they are able to demonstrate, in a setting involving enhanced judicial scrutiny, that they possessed a body of reliable evidence upon which they predicated their decision. *Barkan*, 567 A.2d at 1287. Our Supreme Court has stated:

> When multiple bidders are competing for control, this concern for fairness forbids directors from using defensive mechanisms to thwart an auction or to favor one bidder over another. *Id.* When the board is considering a single offer and has no reliable grounds upon which to judge its adequacy, this concern for fairness demands a canvas of the market to determine if higher bids may be elicited. *In re Fort Howard Corp. Shareholders Litig.*, Del.Ch., C.A. No. 991, 1988 WL 83147 (Aug. 8, 1988). *When, however, the directors possess a body of reliable evidence with which to evaluate the fairness of a transaction, they may approve that transaction without conducting an active survey of the market.* As the Chancellor recognized, the circumstances in which this passive approach is acceptable are *limited.*

*Id.* at 1286–87 (emphasis added).

Although "enhanced scrutiny" must be satisfied before business judgment rule presumptions will apply, that does not displace the use of business judgment in the board room. A determination of which of two transactions is the better one for the shareholders requires the directors to exercise business judgment based on adequate information. Ordinarily, as between two competing all cash offers, the board will be required to choose the higher one, but even that is not always the case if the higher offer is subject to uncertainties that create a significant risk of nonconsummation. And where, as here, the competing transactions involve stock as part of the consideration, the valuation of that component requires business judgment

as well. In making a judgment that one transaction is superior to another, the directors may take long-term strategic considerations into account. But what is critical is that the board be able to demonstrate that its business judgment was reasonable and adequately informed, consistent with the enhanced judicial scrutiny applied here. It is in this sense that the directors' duties under *Revlon* and their fundamental due care obligation to adequately inform themselves converge.[44]

In this case the directors determined not to conduct an auction or premerger agreement market canvass to elicit higher bids. Their view that the Viacom transaction is the superior one rests upon the information furnished by management and the board's financial advisors. The defendants claim that that information is a sufficient reasonable factual basis to support that judgment. The plaintiffs claim that it is not, that the board's decision to prefer Viacom is not fully informed, and, hence, is unreasonable. This dispute brings us to the next question, which is: was the board's decision not to consider QVC's offer at its November 15 meeting fully informed?

### C. Whether the Board Discharged Its Duty To Be Fully Informed

In assessing whether the directors were properly informed, the Court must take into account the reasonableness of the steps taken by the board to inform itself. In that regard, two preliminary perspectives are essential.

*First*, since at least September 9, the mindset of the board has been patently unreceptive to gathering information by way of exploring or even discussing any alternative transaction. That predisposition is reflected in the board's approval of a lockup stock option of unprecedented magnitude (*See* Part IV, *infra*), and of the "no shop" provision in the Merger Agreement that management (and the board) have chosen to interpret as forbidding them from even holding discussions with QVC to obtain information about

---

**44.** In an enhanced scrutiny context, however, the directors are not cloaked with the normally applicable presumption that they acted with appro-

priate due care. The enhanced scrutiny required by *Revlon* imposes upon the directors the burden of showing the reasonableness of their conduct.

its competitive bid. Ironically, however, the reasons for that partiality are not venal but laudatory. The independent directors have no demonstrated self-interest in the Viacom transaction, or in perpetuating Mr. Davis or themselves in office. What drives their conduct is a fervently and honestly-held view that the Viacom deal is the *only* valuable transaction that will serve the best interests of Paramount and its shareholders. I do not fault that belief. However, as this case shows, it is difficult for anyone adhering to that view to explore the merits of a competing transaction with any vigor.

*Second,* I find no basis to criticize the sufficiency of the board's information or processes up to November 12, when QVC raised its offer to $90 on the "front end." To be sure, QVC's initial proposal was higher than the value of the original September 12 deal with Viacom. However, Viacom's increased offer was at first essentially identical to QVC's (on a present-value basis) and then later became higher by $5 per share (again, on the "front end"). Moreover, the board had the benefit of a Lazard analysis that supported the directors' conclusion that the revised Viacom deal was more valuable to shareholders. Thus, if there were any arguable defects in the board's information-gathering process, they were immaterial, because after October 24 the board was in a position quite credibly to justify its deal with Viacom on the basis of immediate value alone. That changed, however, beginning on November 12. The record now shows that QVC's offer is superior in terms of immediate value.

The directors argue, however, that QVC's superior short-term values do not matter, because on November 15 the board made an informed business judgment that the Viacom offer is still the superior transaction, for two reasons: (i) the Viacom transaction offers greater long-term value because of the synergistic, strategic benefits that a Paramount–Viacom transaction will afford; and (ii) the QVC offer is so highly conditional and speculative that it must be disregarded as not being a "real" alternative.

Thus, the question finally becomes whether the directors have demonstrated that they were sufficiently informed to have a reasoned basis for that conclusion. I find, for the following reasons, that they have not.

The defendants make much of the "conditions" to QVC's tender offer and of that offer's supposedly illusory nature. The board is, of course, entitled to take such conditions into account in evaluating the QVC bid. But, the board's position might be more persuasive had management or the board first chosen to discuss those conditions with QVC, to ascertain which of them would likely be fulfilled or waived, before concluding *a priori* that the conditions were fatal and dismissing them out of hand. It is commonplace for tender offers to have conditions of some kind. That, however, does not render them "illusory". If the mere existence of conditions permitted a board to ignore a higher competing bid for control on that basis alone, *Revlon* and *Unocal* would have little meaning. In this case, discussions with QVC would have revealed (for example) that QVC's financing commitments would soon be in hand. Here the board did not even ask QVC on November 15 (as it had in September) to produce evidence of its financing. A discussion with QVC would also have revealed that QVC had received (or would imminently receive) Hart–Scott–Rodino antitrust clearance. But meeting with QVC was the last thing management wanted to do, and by skillful advocacy, management persuaded the board that no exploration was required.

Those are not the actions of a board motivated to inform itself of all available material information. On this record I am constrained to conclude that the "conditionality" of QVC's offer was more a pretext than a problem, which management (and the board) have chosen to hide behind in order to avoid obtaining information that might induce them to take a second look.

The defendants' second rationale for insisting upon the Viacom transaction without affording an opportunity for shareholder choice is that it offers greater value to shareholders in the long-term than the present value of QVC's competing offer. I am convinced that the directors sincerely believe this to be the case, and perhaps it is. But in this particular setting, instincts and sincere beliefs are not enough. At stake here is a *$1.3 billion* dif-

ference between two competing proposals— value that would otherwise flow to Paramount's shareholders. The directors claim that they are justified in preventing the shareholders from receiving that value, because the *future* incremental value of the Viacom combination will exceed that $1.3 billion. But the directors have not come forward with any quantitative valuation data to support that judgment. Even in *Time,* where there was no change in control and thus no heightened duty, the directors had been furnished a valuation performed by investment bankers showing that the value of Time in a sale was within a range, the upper portion of which exceeded the amount of Paramount's offer. *Paramount Communications, Inc. v. Time, Inc.,* Del.Ch., C.A. No. 10866, 10670, 10935, Allen, C. (July 14, 1989), slip. op., *supra* at 30–31, 1989 WL 79880. No such valuation or other valuation quantitatively supporting the board's economic judgment was made here.[45]

The defendants argue that such quantitative valuations should not be required, and that corporate boards should be permitted to make judgments as to long-term strategic value based on their business instinct and experience. In other circumstances that may be sufficient. Undoubtedly, instinct and experience play a role in these decisions, and directors must bring both to bear on vital decisions of this kind. But the qualitative concept of long-term "strategic value" upon which the board's decision rests is not infinitely elastic from a valuation standpoint. Were the spread between the QVC and Viacom offer $5 billion or even $10 billion, could instinct alone justify a refusal to consider the QVC transaction? In this case at least, the enhanced duty of the directors obligated them to have more information. Having chosen not to obtain such information by conducting an auction or a market check, and having determined not to meet with QVC to ascertain what its best and highest offer might be, the board put itself in a position where it had a heightened duty to obtain

reliable information from other sources. That information was not obtained.

\* \* \*

For these reasons I conclude that the Paramount defendants failed to discharge their duty under *Revlon.* Consequently, the board cannot be permitted to render its "poison pill" Rights Plan and other structural antitakeover mechanisms inapplicable to the present Viacom transaction, so as to permit that transaction to close and thereby preclude the shareholders having the opportunity to consider the QVC offer. *See AC Acquisitions Corp. v. Anderson, Clayton & Co.,* Del.Ch., 519 A.2d 103, 116 (1986).

## IV. THE LOCKUPS

What remains to be decided is the validity of the lockups. Under Delaware law, lockup agreements are not *per se* illegal. *Revlon,* 506 A.2d at 183. Our law permits lockups if they "confer a substantial benefit upon the stockholders," as in the case of a lockup that is "necessary to draw in any of the bidders into the contest," and if they are approved by a fully informed board decision. *Macmillan,* 559 A.2d at 1284, 1286 (1988). Lockups, however, which foreclose further bidding operate to the detriment of shareholders. *Revlon,* 506 A.2d at 183. This Court has recognized that even lockups that effectively tilt the playing field in favor of the holder of those rights may still be in the best interest of shareholders. *In re J.P. Stevens & Co., Inc. Shareholders Litigation,* Del.Ch., 542 A.2d 770, 782 (1988). Thus, lockups thus may either encourage or deter further bidding, depending upon the circumstances.

Applying these principles, I evaluate separately the termination fee and the stock option lockup at issue here.

### A. The Termination Fee

Termination fee agreements will be struck down if they are the product of disloyal action or a grossly negligent process on the part of the board of directors. *J.P. Stevens,*

---

**45.** It appears that some directors relied upon the Booz–Allen report in reaching the conclusion that the Viacom transaction offered greater synergies than a QVC transaction. I find, however, that this report was not a sufficiently reliable basis for such a conclusion, as it represented only a management consultant's "first cut" at evaluating the two transactions, and, more significantly, because no nonpublic information about QVC was made available to Booz–Allen.

542 A.2d at 783. In this case, Paramount agreed to pay to Viacom the $100 million termination fee if the merger agreement with Viacom were terminated due to a competing transaction or if Paramount shareholders failed to approve the Viacom transaction. I perceive no basis to conclude that in agreeing to this fee, the Paramount board breached any duty, including its duty to seek to achieve the best available transaction for the shareholders.

Paramount's agreement to pay Viacom a $100 million termination fee was the product of arms-length bargaining, as evidenced by Viacom reducing its fee demand from $150 million to $100 million and by Paramount's rejection of Viacom's separate demand for payment of its expenses. *See supra* at 1251. Although the absolute dollar amount of the fee is quite large, it represents only 1.2% of the value of the Original Merger Agreement and a smaller percentage of the value of the present Viacom deal. Levitt Aff., ¶ 5. This fee reasonably reflects the actual expenses Viacom estimated it would incur in making and defending its bid. *See Roberts,* slip. op. at 21 (noting a limited (2%) breakup fee). Corroborating the reasonableness of this amount is the fact that QVC itself projected (pro forma) $100 million of transaction costs to acquire Paramount. PEx. 52 at 4. I therefore conclude that the granting of the termination fee by the Paramount board was a reasonable action, since its purpose and effect would be to compensate Viacom for its efforts in pursuing a combination with Paramount. Stated differently, the $100 million amount represents a fair liquidated amount to cover Viacom's expenses should the Paramount–Viacom merger not be consummated. Because that fee was valid from the inception of this transaction, its payment (should Viacom become contractually entitled to it) will not be enjoined.

### B. *The Stock Option*

The stock option, however, is problematic. Although the record indicates that Viacom insisted upon a stock option as a condition to the Original Merger Agreement, it also establishes that Paramount's purpose in granting the option was to "lockup" the deal and make the "deal ... look strong." QEx. 61 at L6625; Silberman Dep. 108 (director admitting that the stock option "was a question of protecting the deal"). I am persuaded that Paramount had two purposes in granting the stock option: the proper purpose of inducing Viacom to bid, and the improper purpose of "locking up" the deal for their favored suitor and to deter other potential bidders. I further conclude that the stock option does, in fact, have such a preclusive effect. In addition, I conclude that the directors were not adequately informed as to whether the stock option would promote the shareholders' interest in obtaining the best available transaction.

#### 1. *The Board's Intent*

Although there is precedent for the grant of a stock option for 19.9% of the company,[46] this particular option is unprecedented in its absolute dollar amount and other features. Specifically, the dollar amount of the option value was not "capped" and the option may be exercised and paid for with a subordinated note. With no upper dollar limit on the value of the stock option, that option would foreseeably operate to reward Viacom for making a low initial bid, because its value was tied to the original September 12 Viacom deal price of $69.14. If a bidding contest developed, the costs to a competing bidder foreseeably could (and did) rise to stratospheric heights. If the option or buyout alternative were exercised, the cost to Paramount shareholders, at present bidding levels, would be $500 million.

Making it even more costly for a successful bidder is the feature that permits Viacom to pay for the option shares with a note rather than cash. *See supra* note 9; Greenhill Dep. 172 (noting that he had never seen a feature like this in his investment banking experience). As earlier noted, Viacom may exercise the option by paying only the "par value"

**46.** *See Hecco Ventures v. Sea–Land Corp.,* Del.Ch., C.A. No. 8486, Jacobs, V.C., 1986 WL 5840 (May 19, 1986) (stock option for approximately 21.7% of target's stock); *In re Vitalink Communications Corp. Shareholders Litig.,* Del.Ch., C.A. No. 12085, Chandler, V.C. (May 16, 1990) (stock option for 19.9% of target's stock, but settlement "capped" its value at $1 per share).

portion of the exercise price ($23,699,000 or $1 per share) with cash. The remainder of the option price—*over $1.6 billion*—may be paid in senior subordinated notes of its subsidiary, Viacom International, Inc., which would mature in seven years. Defendants claim that the notes would be "money good" (equivalent to cash) because their interest rate would be set at a level intended to enable the notes to trade at par value. But, the notes cannot be converted into cash unless they are first registered. The Stock Option Agreement provides that while Paramount can request that the notes be registered, Viacom has no unconditional obligation to register them if to do so would affect the market for Viacom's other debt securities. Thus, it is not certain that the notes would be marketable, or even if marketable, would trade at par value. The notes could, therefore, detrimentally affect the capital structure of Paramount. An acquiror other than Viacom would be left owning a company diluted of 20% of its equity, and which held notes unlikely to be convertible into cash. That unique feature, in conjunction with the unlimited potential dollar size of the stock option if exercised, persuades me that both the intent and the effect of this option was to deter competitive bids.

### 2. Was the Board Well Informed?

Even if the board did not intend to deter bidding, it had no informed basis upon which to grant an option with these draconian features, particularly in light of the fact that Viacom was committed to a merger with Paramount.[47] Under the enhanced duty applicable to a sale of control, the board of directors could not erect obstacles to the shareholders receiving the best transaction reasonably available to them. The stock option was inconsistent with that duty. To repeat, its value to Viacom is tied to the original "deal price" ($69.14) and is uncapped, yet at the time the option was granted, the board had no basis upon which to judge whether $69.14 was the best consideration reasonably available, other than Lazard's opinion that that price was fair.[48] No market check had been conducted to determine whether this was the highest price available, and indeed, as Viacom's own increased bids have shown, clearly it was not. Moreover, it was foreseeable that pegging the exercise price to the original deal price ($69.14) could reduce Viacom's incentive to increase its offer in the face of a higher competing bid. That is because Viacom could profit significantly by allowing a competitive bidder to make the highest bid and then exercising its option. For these reasons, I find that the board could not have reasonably concluded that the stock option was calculated to ensure that the shareholders would obtain the best transaction available.

Because the Paramount board granted the stock option in violation of its fiduciary duty, the exercise of the stock option (or its alternative buy-out provision) must be enjoined.[49]

47. For example, Mr. Redstone had publicly stated that Viacom was attempting to get Mr. Davis "to the altar" for the last four years. QEx. 22 at 7.

48. This fact distinguishes this case from those prior cases cited to the Court where Delaware courts have upheld the granting of stock options of similar size. Cf. *Yanow v. Scientific Leasing*, Del.Ch., C.A. Nos 9536, 9561, Jacobs, V.C., 1988 WL 8772 (Feb. 5, 1988, revised Feb. 8, 1988) (16.6% option granted after extensive market search produced only one bidder); *Hecco Ventures, supra*, n. 47 (stock option granted to higher bidder at the end of a bidding contest).

49. The Court has considered Viacom's interest in this transaction. The Court is mindful that in considering the request for a preliminary injunction "it must be alert to the legitimate interests of the public or innocent third parties whose ...

legitimate interests might be affected by the issuance of the remedy." *In re RJR Nabisco, Inc. Shareholders Litigation*, Del.Ch., Consol.C.A. No. 9991, Allen, C., Mem.Op. at 31, 1989 WL 7036 (Jan. 31, 1989). Where, as here, a third party's (Viacom's) contractual rights are derived from a corporate directors' breach of a fiduciary duty, the need to protect the interest of stockholders outweighs any injury to Viacom, even though it has not been shown that Viacom committed any wrongdoing. See *MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.*, Del.Ch., 501 A.2d 1239, 1251 (1985) *aff'd*, Del.Supr., 506 A.2d at 185 (enjoining exercise of lockup option and termination fee provisions of merger agreement); *In re Holly Farms Corp. Shareholders Litigation*, Del. Ch., C.A. No. 10350, Hartnett, V.C., 1988 WL 143010 (Dec. 30, 1988) (same).

## V. *CONCLUSION*

With the exception of the termination fee, I conclude that the plaintiffs have established probable success on the merits of their claims, and the likelihood of irreparable harm that is not outweighed by any countervailing equity favoring the defendants.[50]

Accordingly, the plaintiffs' motion for a preliminary injunction is granted. Counsel shall submit an appropriate form of order consistent with the rulings in this Opinion.

50. Since the opportunity for shareholders to receive a superior control premium would be irrevocably lost if injunctive relief were not granted, that alone would be sufficient to constitute irreparable harm. In any event, *Revlon* itself is ample authority on the irreparable harm question. *Revlon*, 506 A.2d at 185.